really intended to leave here Tuesday in despair, and then thought better of it. I have lost all heart. and only have hope. I stay here simply because I can do a little (only a little, however), and to have it appear in New York that I am helping Allen. I am trusting to luck, and going it blind," &c. On the 26th he writes: "Allen will send you every dollar of paper he can to-day. The Trust Co. has $50,000 paper with the call loan. Then, after using them, discount that. It is a poor lot, what you have. I know no other way than to borrow paper of Coe, and to take up that $100,000 lot in part with the proceeds." It may here be added that on the 6th day of January, 1875, only a few days after Blennerhassett's letters to Mr. Coe. Stephens and Blennerhassett borrowed of the American Exchange Bank of New York $100,000, and placed as security $150,-000 of Cook County paper, out of which only about $40,000 have been paid, leaving still due to that bank from the Cook County about $60,000. The unpaid paper was mostly made by B. F. Murphy & Co., A. T. Andrews & Co., and H. M. Rush & Co., in all of which concerns B. F. Allen was the principal partner, and the only one on whose credit the paper was taken. Allen is still indebted to that bank on this $100.000 loan $60,000.

It was argued at the bar that the creditors of Allen have no good ground of complaint, because the advances made under the mortgage resulted to their benefit. The original debt secured by the mortgage was all paid, and the amount now claimed, of about $800,-000, consists entirely of advances made subsequent to the execution of the mortgage. The advances were made to the Cook County Bank, but it is argued that through the Cook County Bank Allen's private bank received the sum of $72,396.57 between the 18th day of November, 1874, and the 19th day of January, 1875, and the sum of $258,424.12, before the date of the mortgage, on the 18th day of November, 1874, out of the money advanced by Allen, Stephens & Co. In the same connection, it is further said that the total deposits in Allen's bank Nov. 18, 1874, were $726,783.16, while the total Jan. 9, 1875, was $690,657.44, making a gain to depositors of $36,125.72.

If we understand this argument, it seems to us wholly untenable. It is no answer to one set of creditors, who have been misled, deceived, and defrauded of their money, to show that other creditors of the same debtor may have been benefited to an equal or greater amount by advances made by the party committing the fraud. If the New York bankers were induced by the fraudulent acts of Allen, Stephens & Co. to advance money for the Cook County Bank upon the paper of Allen and his partners, and if their advances remain unpaid, it is certainly no answer to their claims to show that the money furnished by Allen, Stephens & Co. was, by the Cook County Bank, in its turn advanced to Allen's private bank, so as to benefit his individual creditors. If one depositor was defrauded and lost his money, it avails nothing to show that another depositor received payment out of funds furnished by the defrauding party.

For these reasons, it is our judgment that the mortgage in question was fraudulent and void as to creditors at common law, and that the plaintiff's bill must be dismissed.

[On appeal to the supreme court, the above judgment was affirmed. 105 U. S. 100.]

STEPHENSON'S EXECUTORS (UNITED STATES v.). See Case No. 16,386.

## Case No. 13,370.

STEPHENS & C. TRANSP. CO. v. WESTERN UNION TEL. CO.

[Nowhere reported; opinion not now accessible.]

## Case No. 13,371.

STEPHENS & C. TRANSP. CO. v. WESTERN UNION TEL. CO.

WESTERN UNION TEL. CO. v. STEPHENS & C. TRANSP. CO.

[8 Ben. 502.] [1]

District Court, E. D. New York. July, 1876.[2]

SHIPPING—SUBMARINE CABLE—DAMAGE TO PASSING BOAT—REFUSAL OF ASSISTANCE —NEGLIGENCE.

1. Where a telegraph cable, laid across the Passaic river at Newark, N. J., under water. was caught up by the screw of a propeller that backed up over the crossing-place, and was wound around the shaft, so that the cable was broken and damaged, and the propeller had to go on the dock to get off the cable and repair damage to her machinery: *Held*, that the telegraph company was bound not only to lay, but also to maintain its cable, in such a way as not to interfere with the movements of boats engaged in proper manœuvres at that place;

2. The boat was not in fault in endeavoring to free herself from the cable by such devices and skill as were at her command; nor for refusing an offer of assistance from the employees of the telegraph company, made at a time when it was thought the screw was cleared from the cable:

3. The telegraph company was liable for the injury to the boat, and the owners of the boat were not liable for the injury to the cable.

[Cited in The City of Richmond, 43 Fed. 87.]

The Western Union Telegraph Company had laid, some years previously, submarine cables across the Passaic river. at the draw of a railroad bridge at Newark, N. J. In October, 1872, a propeller the Cement Rock, backed up

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed by circuit court. Case unreported.]